In the
United States Court of Appeals
For the Seventh Circuit

No. 00-4220

United Air Lines, Incorporated,

Plaintiff-Appellant,

v.

International Association of Machinist and
Aerospace Workers, AFL-CIO, District Lodge 141-M,
IAMAW, Air Transport Employees Local Lodge 1781,
IAMAW, et al.,

Defendants-Appellees.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern
Division.
No. 00 C 7265--William J. Hibbler, Judge.

Argued February 22, 2001--Decided March 14,
2001

   Before Bauer, Coffey, and Manion, Circuit
Judges.

   Bauer, Circuit Judge. United Airlines
("United") appeals from the denial of a
preliminary injunction which it had
sought against the International
Association of Machinist and Aerospace
Workers, AFL-CIO ("IAM") in order to com
pel IAM to exert every reasonable effort
to discourage its member mechanics from
engaging in a concerted work slowdown at
United. For the reasons set forth below,
we reverse the decision of the district
court.

BACKGROUND

   United is a "carrier" as defined by sec.
201 of the Railway Labor Act ("RLA"), 45
U.S.C. sec. 181. IAM is the certified
exclusive bargaining representative of
six different crafts or classes of United
employees, including the mechanics craft

or class. In 1994, IAM and United negotiated a collective bargaining agreement ("CBA"), which by its terms became amendable on July 12, 2000 The parties entered into negotiations in December of 1999 but were unable to reach an agreement by July 12, 2000.

In September of 2000, United and IAM jointly applied to the National Mediation Board ("NMB") for mediation pursuant to sec. 5 of the RLA, 45 U.S.C. sec. 155. The RLA requires both parties to maintain the status quo during mediation (that is, it forbids either party from unilaterally altering the working conditions in place, broadly defined). Negotiations between the parties broke off on October 31, and resumed on December 7. The talks continue as of the time of this decision.

Beginning shortly after July of 2000, and continuing in varying degrees up to the present time, United has experienced various maintenance-related anomalies which it interprets as a deliberate "slow down" campaign on the part of its mechanics. Specifically, United has experienced a greater than normal number of maintenance write-ups/1 by mechanics, longer than usual "cycle times"/2 at its Indianapolis Maintenance Center, a sharp increase in the number of aircraft held out of service for unscheduled maintenance,/3 and an increase in maintenance-related flight delays and cancellations. By November 10, 2000 United suspected that IAM was directing or encouraging the work slowdown, and on November 10, 2000 United Senior Vice President Andrew Studdert wrote a letter to IAM District Lodge 141-M General Chairman Scotty Ford calling on the union to halt what he called the "concerted job action by employees represented by District Lodge 141-M." In the letter, Studdert complained that IAM employees were submitting excessive mechanical write-ups making erroneous claims of missing equipment, and failing to work scheduled overtime. Studdert characterized the mechanics' conduct as "clearly concerted and appear[ing] to be in direct response to misleading communications from the IAM about the Company's position at the bargaining table, inaccurate descriptions of other management decisions, and clear 'work to

rule' campaign directives from District Lodge 141-M." Studdert then reminded Ford of IAM's duties under the RLA to maintain the status quo during ongoing negotiations, and noted that IAM's failure to observe this duty was illegal and enjoinable in federal court. Finally, Studdert requested IAM and its members to return to the status quo immediately. He demanded an immediate end to IAM communications containing misleading information about United's bargaining positions, as well as "an immediate end to work to rule directives, and any other steps necessary to secure an immediate end to this disruptive behavior."

On November 14, 2000, Scotty Ford sent Studdert a letter in response. In the letter, Ford stated that he "greatly resent[ed] what can only be seen as an attempt to threaten and intimidate this Union and its members during these negotiations." Ford denied that IAM had encouraged any employee to violate either the CBA or the RLA, and he requested Studdert to present specific evidence that either the District or any of its officers were doing so. Ford asserted that recent communications from the IAM District 141-M Negotiating Committee had "repeatedly advised the [union] membership not to take part in any job action and has gone so far as to recommend that members work overtime." Ford contended that recent actions by United management (including the "discharge of 108 mechanics in Los Angeles") were the "true reason behind any so-called 'disruptive behavior'" on the part of IAM mechanics, and he accused United of trying to "censor" IAM communications.

One week later, United moved for a temporary restraining order ("TRO") and a preliminary injunction. United asked the court to prohibit United's mechanics from engaging in a slowdown campaign and to order the IAM, its district and local lodges, and their officers to take specific steps to stop ongoing slowdown activity. In support of its motion, United produced three categories of evidence: (1) statistical evidence of a slowdown campaign, along with testimony by United managers describing their personal observation of slowdown

activities by mechanics; (2) letters and bulletins issued by IAM District Lodge 141-M and IAM's local lodges during October and November 2000 which United claimed constituted a deliberate slowdown campaign directed by IAM; and (3) letters and flyers posted by individual mechanics during the same period that encouraged work slowdowns and other job actions. These categories of evidence are addressed in turn.

(1) Statistical evidence of a slowdown/managerial testimony

United's statistical evidence revealed the following: (1) a jump in the number of maintenance write-ups from historical levels of 1050-1100 maintenance items per day to 1350 per day in July of 2000, and climbing to almost 1500 per day during the first two weeks of November (after the contract talks broke off); (2) an increase in cycle times for scheduled maintenance checks at United's Indianapolis Maintenance Center beginning in July and rising to almost double their historical averages during September through November 2000; (3) an increase in the number of aircraft held out of service for unscheduled maintenance at any given point from the historical average of roughly 12 to nearly 30 in July, followed by a slight decrease in September through November, and a subsequent increase to 35 a day during the first two weeks of November; (4) an increase in the percentage of United flights that are delayed due to mechanical problems from the historical average of roughly four percent to over seven percent in July through August 2000, then dipping to six percent in September and October, and climbing again to approximately eight percent during the first two weeks of November; (3) A doubling of the percentage of flight's cancelled due to mechanical problems from the historical average of roughly one percent to over 2.5 percent in July through August 2000, followed by a decline to approximately 1.5 percent in September and October, and another increase to two percent during the first two weeks of November./4

In addition, United produced testimony from the managers at each of United's large and medium-sized maintenance bases, many of whom described their personal ob

servations of mechanics making repeated and unnecessary references to maintenance manuals, refusing en masse to work voluntary overtime, writing up maintenance items immediately before flight time (causing delays and cancellations), and writing up cosmetic defects which ordinarily would be ignored, such as torn foot rests, worn arm rests, and chipped paint.

(2) Letters and bulletins issued by IAM District Lodge 141-M and other local lodges

On October 3, 2000, District Lodge 141-M--the body authorized by IAM to negotiate the CBA between the mechanics and United--sent a bulletin to all IAM aircraft maintenance personnel stressing the importance of ensuring that aircraft be in airworthy condition before being returned to service as required by the federal aviation regulations. The bulletin noted "apparent inconsistencies in the procedures of reporting maintenance discrepancies on United Airlines aircraft." Specifically, it noted that according to IMCOP operating procedures, mechanics should report discrepancies to the Airframe team leader or the lead mechanic "to determine whether a write-up is necessary," but the Administrative and Operating Policy suggested that write-ups can be generated by dock personnel. The bulletin urges individual technicians to write up problems and to repair, replace, or defer the discrepancy if necessary, and it further exhorts the mechanics: "If you find something wrong on an aircraft, ACTION MUST BE TAKEN!" (emphasis in original). First Norman Aff. para. 8, Exhibit 1.

On October 13, District Lodge 141-M sent a bulletin to its member mechanics under the prominent title "Negotiations." The bulletin opens by describing the recent progress of the negotiations between United and the IAM (which it casts in a negative light), and proceeds to admonish member mechanics to "work safe":

This week we can report that almost no progress was accomplished . . . Your Committee has made it clear that any company proposal involving job

concessions not withdrawn would place these negotiations in jeopardy and could result in the IAM seeking self-help. . . . We have been made aware of several incidents of aircraft damage around the system. Luckily, no employees have been injured. We hope that the stress and anxiety of these contract negotiations have not been contributing factors. We need to remind every employee that SAFETY COMES FIRST! We don't need aircraft damage and certainly do not want anybody injured. PLEASE WORK SAFE, take no part in any job action, don't believe rumors, and remain solid behind your Committee.

United introduced testimony from some of its maintenance officials that phrases such as "work safe" are commonly recognized by United mechanics as code words calling for a work slowdown.

A posting on the IAM website during the same time period echoed this message to "work safe." An October 27 website posting by the District 141-M negotiating team recounts the recent status of negotiations, and then reminds members to "not believe rumors," "be supportive," "[w]ork safe," and "[t]ake no part in any job action." Id. at para. 10, Exhibit 3. In addition, a November 10 posting on the same website reported that the NMB had adjourned the current round of negotiations, and stated that United had not submitted realistic wage proposals. It announced that IAM had called for a release from further negotiations "in order to begin the 30-day countdown," and quoted Ford as saying: "We do not believe United will bargain seriously without additional pressure . . . . After 6 years of dedication and sacrifice by IAM members and 6 years of historic profits by United, it's payback time . . . . The sooner United understands that the better." The posting concluded: "while the Railway Labor Act allows for near-endless negotiations in the airline industry, the membership of this union does not." Id. at para. 11, Exhibit 4.

On October 19, 2000, one of IAM's local lodges issued a bulletin which stated: "The company started its 'job action letter campaign' Tuesday in retaliation to the I.A.M. Negotiating Committee's

update of October 13, stating WORK SAFE! This has obviously made the company upset." The bulletin went on to excoriate United for its strong-armed management techniques, and asserted: "The ugly truth is we are at war, all out war!" Id. at para. 13, Exhibit 6.

United also presented bulletins and memos which it claimed were issued by other IAM Local Lodges/5 that stressed the "safety first" message even more emphatically. For example, a bulletin which purported to come from IAM Local Lodge 1781 prominently displayed the words "Safety First" twice and stated:

We must work even harder at performing our jobs in a safe manner . . . . We must also be aware that we have a responsibility to comply with the many FAA and CAL/OSHA regulations required to perform our daily jobs, no matter how long it takes . . . . It is imperative that, in these times of stress, uncertainty and distractions; working safely, within our skills, must be our number one concern. NO JOB IS SO URGENT THAT IT CAN'T BE DONE SAFELY. (emphasis in original). Id. at para. 14, Exhibit 7.

In late October or early November, three virtually identical bulletins appeared in three separate United maintenance bases under the headings "Negotiations 2000," "Millennium Negotiations," and "Lodge 1781 Strike Committee." One of them appeared on an official IAM bulletin board inside of a locked, glass case. The bulletins read, in part:

In keeping with the "Safety First" ideal, it is time for us to examine our tools and equipment. Greasy wrenched could result in personal injuries and damaged parts. Check your boxes and tools. If they haven't been cleaned lately, give some thought to safety and clean them daily.

Some tools need lubrication to work properly. Knives need to be sharpened to work efficiently and safely. Now is the time to take care of these needs.

Machinery and equipment also should be checked for safety. Fork lifts, tugs, drive belts, fitting devices, baggage equipment, food service equipment . . . all should be checked thoroughly. If it isn't safe, shut it down and get it fixed. (emphasis in original).

Finally, a memo bearing the IAM seal and purporting to be from Local Lodge 1487 in Chicago further reinforced the message under the heading of Work Safe. The memo complains of excessive and inappropriate discipline by United which it characterizes as constituting "an environment of intimidation." The memo goes on to say, in part:

We, as the Grievance Committee, feel obligated to advise you how to stay out of trouble during these oppressive times. We advise you to take the advice given by Scotty Ford, D-141M President and General Chair, on the bulletin dated Oct. 15, 2000 and WORK SAFE. Do not let outside influences distract you from the job at hand. The utmost importance must be put on SAFETY so we can return to our families after work.

They created this atmosphere, now we have to deal with it. If you do not follow the rules and procedures you will be disciplined up to and including discharge. For this reason we are asking our members to be careful, follow all procedures and WORK SAFE!!! (emphasis in original.) Id. at sec. 16, Exhibit 9.

IAM denies that it issued these bulletins.

(3) Letters and flyers posted by individual mechanics

United also produced a number of leaflets, flyers, and website messages which it claimed were distributed in United's maintenance facilities or directed at United mechanics that explicitly acknowledged and encouraged slowdown activities. For example, a flyer entitled "TURN UP THE HEAT" and addressed to United's CEO, Jim Goodwin, which was posted in San Francisco stated: "We, as professionals, do not enjoy work slowdowns, but you leave us no choice. .

. . NO OVERTIME November 21-28[:] 1. Starting 0500 11/21[;] 2. No Four Overs[;] 3. No Easy-Hours[;] 4. No Early Starts[;] 5. No Working Through Lunch. P.S. We will remember those who work!!" Id. at para. 20, Exhibit 13. In addition, United claims that it received other flyers on or about November 7, 2000, which stated, respectively: "[L]et's screw the bastards royally. It's time to turn up the heat," and "LET'S MAKE THIS THE HOLIDAY SEASON FROM HELL!!!!!!!!" Id. at para.para. 21 and 22, Exhibits 14 and 15. The third flyer which was signed "IAM AFL/CIO" but was not on IAM letterhead stated: "the members of the International Association of Machinists at United Airlines wish to make it known that they must act aggressively against their company during the upcoming holiday travel season. Actions to be taken will include massive slow downs and delaying tactics beginning in late November, 2000 . . . ." Id. at sec.23, Exhibit 16. IAM denies issuing any of these flyers.

On November 17, 2000, after hearing argument from both sides, the district court found that United was "likely to succeed on the merits of its claims that Defendants are violating the RLA," that United was suffering "immediate, substantial, and irreparable injury" in the form of lost revenue and consumer goodwill, and that the harm to IAM from the issuance of the TRO would be "inconsequential when compared to the loss and hardship which United and the public will suffer." Accordingly, the court issued a TRO prohibiting IAM and its members from engaging in or encouraging any kind of slowdown activity or other work action designed to interfere with United's airline operations, and ordering all officers of IAM's district and local lodges to "take all reasonable steps within their power" to prevent the enjoined actions, by (inter alia) notifying all IAM mechanics of the issuance, contents, and meaning of TRO in "the most expeditious means possible," putting this notice on IAM's websites and recorded telephone hotlines, instructing all IAM-represented personnel to resume their normal working schedules and practices, and directing members to end any slowdown activity (and any communications encouraging such activity) upon pain of fine, suspension, or other

sanction by IAM. In response to concerns expressed by IAM's counsel that the TRO might discourage IAM mechanics from performing their jobs with their usual care, the court added to the TRO the following sentence: "This notice in no way is meant to have impact upon each mechanic's exercise of their usual diligence in providing appropriate safety for all aircraft."

The TRO was not initially effective. Indeed, the situation appeared to worsen considerably after its issuance. In the days following the TRO: (1) the number of write-ups increased to an average of over 1500 per day, with an all-time peak of 2037 on November 22; (2) from November 18-30, the average number of out-of-service aircraft increased to 42 with an all-time high of 52 on November 26; (3) during the same period, the number of maintenance-related flight delays increased to 8.8 percent of all flights; (4) in the same period, the number of flight cancellations due to mechanical problems increased to 2.5 percent of all flights. Each of these figures represented an appreciable increase from the corresponding levels for the month before the TRO was issued (which were already substantially higher than historical averages). The parties have differing explanations for this. United believes that IAM failed to comply with the TRO./6 IAM claims that it fully complied with the TRO, and argues that the ineffectiveness of the TRO demonstrates that, to the extent that any illegal work action was occurring at all (which IAM did not concede), such action was being performed by dissident mechanics who were not in the union's control.

On November 21, IAM filed the declarations of seven of its officers describing its compliance with the TRO. On the following day, United filed a motion seeking to hold IAM in contempt of the TRO. On November 27, the parties held a telephonic conference with the district court, during which the court instructed United to identify particular individuals who United felt were continuing to act inappropriately, and to inform IAM of who, when, and where such inappropriate actions were taking place in order to

facilitate IAM's efforts to implement the TRO. The court also admonished IAM to "do all in its power . . . to effectuate the stoppage of any work action by the mechanics," and to "take appropriate aggressive actions in those instances where the company has pointed out continued work actions are taking place." Shortly thereafter, United supplied IAM with the names of 144 mechanics whom it believed were performing an excessive number of write-ups and identified stations that were suffering a disproportionate number of problems. United asked IAM to counsel the mechanics that it had identified. It also requested the IAM officers who are individual defendants in the case to conduct personal briefings at each work location to "explain what the TRO and status quo means," "explicitly explain that all slowdown messages are no longer valid," and to "convey with absolute sincerity and commitment that they IAM will abide with the TRO." United also asked IAM to remove all materials encouraging the slowdown (including the original IAM bulletin announcing the TRO), and to post the TRO along with two letters from Ford on all bulletin boards. In addition, on November 30, United's counsel told IAM's counsel that United had incurred $66 million in damages due to the mechanic slowdown since the issuance of the TRO.

Immediately thereafter, the situation began to improve. Between December 1 and 10: (1) the number of write-ups dropped to an average of 1,306 per day; (2) the number of out-of-service aircraft decreased to less than 30 per day; (3) the percentage of flights delayed for mechanical reasons dropped to 6.5 percent; and (4) the percentage of maintenance-related flight cancellations dropped to an average of 2.2 percent. These numbers reflected measurable improvement from the levels in place from November 18-30, although they remained significantly higher than historical levels in all categories. Once again, the parties provide conflicting explanations for this turn of events. United argues that the improvement was caused by IAM's belated efforts to abide by the TRO by aggressively discouraging its members from engaging in a work slowdown. IAM counters that the amelioration was due mainly to United's long overdue efforts to address the situation through its own

management by terminating, disciplining, or at least counseling some individual mechanics whom it believed were responsible for the claimed slowdown./7 IAM also argued that the improvement could be explained, at least in part, by the recent actions that United took against a rival union's/8 website which had been attacking the IAM and expressly calling for a work slowdown among United mechanics.

IAM moved to vacate the TRO on grounds that it did not comply with the procedural requirements of the Norris-LaGuardia Act ("NLGA"). On December 7, 2000, the court denied IAM's motion, but dissolved the TRO sua sponte, stating that there was some proof that the issuance of the TRO "caused some activity on the part of the Union, but at the same time it caused a reaction by those persons who may, as has been alleged, be beyond the control of the Union." The Court also found that "at this point . . . neither party should perceive any advantage by the issuance of the [TRO]," and that "the compulsive reasons for the issuance of the [TRO] have now subsided . . . ." The court then stated:

I think the urgency of the [TRO] in the court's mind was because of the pending travel over the Thanksgiving holidays and also what the court perceived, based upon the information the court had then, was perhaps some activity on the part of the Union if not actively attempting to curtail that activity, maybe in a somewhat covert manner to encourage that activity. I think that the allegation of that activity has clearly been dissipated at this point in the court's mind based upon the submissions of the parties that I have received since the order has been in effect . . . . [B]ased upon the information that I have received, the [TRO] has been somewhat ineffective in requiring the mechanics to do their jobs appropriately without false claims of safety issues in order to undermine the ability of United to service its customers.

The court noted that a hearing on United's motion for a preliminary injunction was set for December 13, and it opined that not having the TRO in effect during that period would "give the

court an opportunity to view without the order in place the activities of the parties," thereby providing "some guidance as to its findings as to whether or not a preliminary injunction should issue."

After hearing oral argument from the parties, the district court denied United's motions for contempt and for a preliminary injunction without written opinion. In denying the motion for contempt, while the court found that the Union did not "immediately do all actions which ultimately were done," and that the manner of its initial posting of the TRO "perhaps was not the most effective way to garner acquiescence and compliance with the order," the court found that these failings did not rise to the level of contempt and that the Union eventually "complied not only with the intent but with the letter of the [TRO] by taking those actions which they thought were prudent and escalating those actions when it appeared that they were not effective." The court also stated that "the facts in this case have convinced the court that there are some members of [IAM]'s union who despite their best efforts have continued to, and perhaps will continue to, act inappropriately and to do these job actions which are not proper." In denying the preliminary injunction, the court stated:

I think that there is somewhat of a mob mentality out there somewhere where people believe as long as we act in concert and groups we are all safe by the fact that no one can be identified, singled out, and held to pay the consequences of their actions . . . . [T]hose persons being identified and subjected to immediate consequences I think is the best way and maybe the only way to insure that the majority of the members of the union continue to act appropriately in this case. I find that this is a much more effective way to control thatmembership than it is for the court to issue an order telling people to do what they are legally obligated to do under the various statutes that control this situation.

United has appealed the district court's denial of its motion for preliminary injunction, arguing that the district

erred both legally and factually in refusing the injunction on the ground that United could more effectively end the slowdown by disciplining and/or terminating those individual mechanics responsible. IAM argues that the district court correctly perceived that the NLGA precluded the injunction unless it would have been the "sole, effective means" of solving the problem, and that the court correctly found that such was not the case here. In addition, IAM argues that sec.sec. 106, 107(a), and 108 of the NLGA barred the injunction, because there is no "clear proof" that the IAM authorized, encouraged or ratified the slowdown, and because United did not make "every reasonable effort to resolve the dispute" before seeking the injunction.

DISCUSSION

In reviewing the denial of a preliminary injunction, we review the district court's findings of fact for clear error, its balancing of the factors for a preliminary injunction under the abuse of discretion standard, and its legal conclusions de novo. See Kiel v. City of Kenosha, 236 F.3d 814, 815 (7th Cir. 2000) (citation omitted); Teamsters Local Unions Nos. 75 and 200 v. Barry Trucking, Inc., 176 F.3d 1004, 1011 (7th Cir. 1999). We accord substantial deference to the trial court's decision because we "recognize the advantage of the trial court's proximity to the evidence." See Teamsters, 176 F.3d at 1011. Therefore, we will not find a district court's factual finding clearly erroneous if it is "plausible in light of the record viewed in its entirety," even if we would have "'weighed the evidence differently' and reached the opposite conclusion." See Air Line Pilots Ass'n Int'l v. United Air Lines, Inc., 802 F.2d 886, 891 (7th Cir. 1986) (citation omitted) ("ALPA"). However, the lower court necessarily abuses its discretion when it commits an error of law, see MacDonald v. Chicago Park District, 132 F.3d 355, 357 (7th Cir. 1997) (citation omitted), and a decision to deny a preliminary injunction that is premised on an error of law is entitled to no deference and must be reversed. See, e.g., Delta Air Lines, Inc. v. Air Line Pilots Ass'n Int'l, 2001 WL 42399, *5 (11th Cir. 2001) (citations omitted).

The RLA was enacted, among other reasons, "[t]o avoid any interruption to commerce or to the operation of any carrier engaged therein," and "to provide for the prompt and orderly settlement of all disputes concerning rates of pay, rules, or working conditions." 45 U.S.C. sec. 151a. The intent of the RLA is "to encourage collective bargaining by the parties 'in order to prevent, if possible, wasteful strikes and interruptions of interstate commerce.'" ALPA, 802 F.2d at 895 (quoting Detroit & Toledo Shore Line R.R. v. United Transp. Union, 396 U.S. 142, 148 (1969) (footnote omitted)). To effectuate these purposes, the RLA imposes a substantive duty upon "all carriers, their officers, agents and employees to exert every reasonable effort to make and maintain agreements . . . and to settle all disputes . . . in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof." 45 U.S.C. sec. 152, First. This duty runs both to management and to labor, and it has been described as the "heart" of the RLA. See Brotherhood of R.R. Trainmen v. Jacksonville Terminal Co., 394 U.S. 369, 377-78 (1969). Moreover, the duty to exert every reasonable effort to make and maintain agreements is a substantive legal duty which is enforceable by the courts. Chicago & N.W. Ry. Co. v. United Transp. Union, 402 U.S. 570, 577 (1971) ("[W]e think it plain that [45 U.S.C. sec. 152, First] was intended to be more than a mere statement of policy or exhortation to the parties; rather, it was designed to be a legal obligation, enforceable by whatever appropriate means might be developed on a case-by-case basis.")

The RLA sets forth a detailed sequence of steps that carriers and their employees (or their employees' representatives) must follow in negotiating CBAs. First, the party seeking a change in rates of pay, rules or working conditions must give notice and confer with the other party. 45 U.S.C. sec. 156. If the parties remain unable to resolve their dispute after this conference, either or both of them may seek mediation by the NMB. See 45 U.S.C. sec. 155. If the mediation fails

to produce agreement, the NMB must attempt to persuade the parties to submit to binding arbitration. If either or both of the parties rejects the offer of arbitration and the dispute threatens "substantially to interrupt interstate commerce to a degree such as to deprive any section of the country of substantial transportation service," the NMB must contact the President who may then create an emergency board to "investigate and report respecting such dispute." 45 U.S.C. sec. 160. If the NMB releases the parties from mediation before an agreement has been reached, the RLA imposes a 30-day "cooling-off" period upon the parties. Throughout this entire lengthy negotiation process, carriers and unions are required to maintain the status quo with respect to rates of pay, rules, and working conditions. See 45 U.S.C. sec.sec. 155, 156. The status quo provisions are "central" to the RLA's design, see Shore Line, 396 U.S. at 150, and they "must be read in conjunction with the implicit status quo requirement in the obligation imposed upon both parties by [sec.152], First 'to exert every reasonable effort' to settle disputes without interruption to interstate commerce" as part of an "integrated, harmonious scheme for preserving the status quo from the beginning of a major dispute through the final 30-day 'cooling-off' period." Id. at 151, 152. If either side unilaterally alters the status quo during the bargaining andmediation process, a court may issue an injunction to put a stop to that party's illegal self-help and to restore the status quo, and it may do so even without the traditional showing of irreparable injury to the other party. See Consol. Rail Corp. v. Ry. Labor Executives' Ass'n., 491 U.S. 299, 303 (1989). This rule authorizes courts to enjoin not only strikes but also "union conduct . . . which has the consequences of a strike," such as refusal of overtime, slowdowns, and sit-ins. See generally ALPA, 802 F.2d at 906 (citation omitted).

However, when a carrier seeks an injunction against a union, "a court must look not only to the RLA but also to the NLGA to determine whether the court has jurisdiction." See Delta Air Lines, 2001 WL 42399 at *4. As a general rule the

NLGA strips courts of jurisdiction to enter injunctions against labor unions in cases growing out of labor disputes, "express[ing] a basic policy against the injunction of activities of labor unions." See Int'l Ass'n of Machinists v. Street, 367 U.S. 740, 772 (1961). The NLGA also provides that "no injunction or temporary restraining order shall be issued on account of any threat or unlawful act excepting against the . . . organization making the threat or commit ting the unlawful act or actually ratifying the same after actual knowledge thereof," 29 U.S.C. sec. 107(a), and that "[n]o . . . organization participating or interested in a labor dispute shall be held responsible or liable . . . for the unlawful acts of individual officers, members, or agents, except upon clear proof of actual participation in, or actual authorization of, such acts, or of ratification of such acts after actual knowledge thereof." 29 U.S.C. sec. 106. In seeking to accommodate the conflicting provisions of the RLA and the NLGA, the Supreme Court has held that where a challenged action violates specific provisions of the RLA (such as the status quo provision of 45 U.S.C. sec. 152, First), "the specific provisions of the [RLA] take precedence over the more general provisions of the [NLGA]," see Pittsburgh & Lake Erie R.R. Co. v. Ry. Labor Executives' Ass'n, 491 U.S. 490, 513 (1989) (quotation omitted); see also Chicago & North Western Ry., 402 U.S. at 581; Brotherhood of R.R. Trainmen v. Chicago River & Indiana R.R. Co., 353 U.S. 30, 41-42 (1957), and courts can issue injunctions to enforce the RLA provisions at issue notwithstanding the NLGA./9 In other words, the Court has carved out an exception from the NLGA's general prohibition on injunctive relief against union activity for violations of specific provisions of the RLA. However, the Court has stated that this exception is a limited one which applies only if an injunction is the "only, practical, effective means of enforcing the duty to exert every reasonable effort to make and maintain agreements," see Chicago & North Western Ry., 402 U.S. at 583, or if "that remedy alone can effectively guard the plaintiff's right." Id. at 582 (quotation omitted).

   United argues that the district court

misapplied the law and abused its discretion in denying its motion for a preliminary injunction under the RLA. First, United contends that since the court found that some of its mechanics were engaging in a concerted job action (that is, a deliberate slowdown) during the mediation process, United was entitled under the RLA to an injunction ordering the union to make every reasonable effort to stop the slowdown even if it could not be determined whether the injunction against the union would have been entirely effective in ending it. Therefore, United asserts that the district court erred as a matter of law when it decided not to issue the injunction solely on the ground that it would be more "effective" for United to address the problem by disciplining or firing the individual workers who were responsible for the slowdown. IAM counters that, given the proscriptions of the NLGA, status quo injunctions can only issue against a union when the injunction would be the "only practical, effective means" of enforcing the RLA, and that the district court was therefore required to inquire into the effectiveness of the injunction, and to deny it once it legitimately concluded that United could more effectively address the problem through management efforts.

We agree with United. While it is true that, given the goals of the NLGA, courts should hesitate to issue an injunction unless it is the "sole effective means," to address the RLA violation, IAM cites no authority (nor have we found any) for the proposition that a district court must deny a preliminary injunction against a recognized violation of a specific provision of the RLA by union members if it determines that the employer could "more effectively" curb the violation by directly disciplining or terminating individual employees. Indeed, such a suggestion runs counter to the spirit of the RLA's status quo provisions. As noted, those provisions impose an affirmative legal duty upon both employers and unions alike--which is enforceable by the courts--to preserve the status quo during the bargaining and mediation process imposed by the RLA. A union has the affirmative duty under the status quo provisions of the RLA to exert every reasonable effort to prevent or

discourage a strike or a concerted work action like the slowdown in this case. See, e.g., Delta Air Lines, 2001 WL 42399 at *6; see generally Shore Line, 396 U.S. at 152-53. Once a court determines that such a concerted work action is occurring in violation of the RLA, an injunction can issue ordering the union to observe its statutory duty by trying to stop it. See, e.g., Delta 2001 WL 42399 at *6. Whether United can diminish or even stop the work slowdown through its own actions has nothing to do with the IAM's enforceable duty to do everything reasonable to end it. To hold otherwise would be to deny the union's independent obligations under the RLA. This is not to say, however, that the limitations placed upon the issuance of injunctions against unions which violate their status quo obligations under the RLA cases are insubstantial. It remains true that courts should only enjoin such violations when the injunction would be the "sole practical, effective means of enforcing the duty to exert every reasonable effort to make and maintain agreements." This clearly implies that where there are other effective means available to accomplish that end, injunctions should not issue. However, requiring United to take efforts to end the slowdown would not be an "effective means" of enforcing IAM's duty to "exert every reasonable effort to make and maintain agreements"; rather, it would be requiring United to assume IAM's duty altogether. Indeed, if we were to accept the premise that a carrier's ability to fire or discipline individual employees is an "effective" remedy for a union's status quo violations, a status quo injunction could never issue against a union, since in virtually every case an employer presumably could take some such measures. Such an interpretation would eviscerate the status quo provisions of the RLA. Therefore, we find that the district court's decision in this case was not justifiable, much less mandated, by the NLGA. To the extent that the district court may have concluded otherwise, it erred as a matter of law./10

    For similar reasons, we also reject IAM's argument that sec. 8 of the NLGA bars United from seeking injunctive relief in this case. That section provides:

No restraining order or injunctive relief shall be granted to any complainant who has failed to comply with any obligation imposed by law which is involved in the labor dispute in question, or who has failed to make every reasonable effort to settle such dispute either by negotiation or with the aid of any available governmental machinery of mediation or arbitration.

29 U.S.C. sec. 108. This section is applicable to injunctions sought by carriers against unions under the status quo provisions of the RLA. See generally ALPA, 802 F.2d at 900, 905-06. By its terms, this "clean hands" provision precludes a carrier involved in a labor dispute with a union from obtaining injunctive relief when the carrier has either: (1) violated a legal obligation with respect to the labor dispute in question; or (2) failed to make every reasonable effort to settle the labor dispute either through negotiation, mediation, or arbitration. See Brotherhood of R.R. Trainmen Enterprise Lodge, No. 27 v. Toledo, P. & W.R.R., 321 U.S. 50 (1944) (holding that, while the RLA does not require either party to a major labor dispute to submit to arbitration, a carrier who refuses this available avenue for settlement cannot obtain injunctive relief under the status quo provisions).

   IAM argues that United did not make every "reasonable effort to settle" the dispute in this case, claiming that United made virtually no attempt to resolve the slowdown through negotiations with IAM before it filed suit. IAM claims that Studdert's November 10 letter to Ford was the first and only time that United mentioned the problem to IAM officials before seeking the injunction, and that the letter was in fact sent immediately after United had thanked IAM for "keeping the lid on" and averting serious work actions during a tense period of negotiations. United disputes these assertions, but we need not credit United's version of the story to dispose of IAM's claim. Section 8 requires a party to a labor dispute to "exert every reasonable effort" to settle the labor dispute in question (through negotiation, mediation or arbitration) before seeking to enjoin an action by the other party

which relates to the dispute. It does not require a party who is already engaging in good-faith effort to settle the labor dispute through negotiation, mediation, or arbitration to "exert every reasonable effort" to prevent or end an unlawful strike or work action before seeking judicial relief. Indeed, requiring a carrier to seek a negotiated solution before moving to enjoin an illegal work action would enable unions to use such actions to extort concessions from the carrier during the negotiation process. Such a result would render the union's duty under 45 U.S.C. sec. 152, First a nullity, and would run directly contrary to the policy rationales of the RLA's status quo provisions. If IAM had demonstrated that United had either violated its own status quo obligations (or some other duty under the labor laws) or had failed to pursue all of the available channels of negotiation, mediation, and arbitration provided under the RLA, then it would have a stronger case for barring the injunction under sec. 8 of the NLGA. However, as IAM has not made any such contention, we must reject its argument under sec. 8./11

   Moreover, it seems clear in this case that an injunction would be the "sole, effective means" of enforcing the IAM's duties under the status quo provisions of the RLA. The district court concluded that a number of United mechanics were engaging in a deliberate and unlawful slowdown (or that a number of mechanics were "do[ing] job actions which are not proper" and acting "in concert" or in a "mob mentality"). This unilateral resort to self-help on the part of union members puts severe economic pressures on United, thereby undermining its bargaining position during the period of negotiation and mediation. This is precisely the kind of action that the RLA status quo provisions seek to prevent, and we cannot conclude that other remedies, short of an injunction, would be effective in doing so. Cf. Int'l Ass'n of Machinists & Aerospace Workers v. Transportes Aereos Mercantiles Pan Americandos, S.A., 924 F.2d 1005, 1011 (11th Cir. 1991).


   IAM also argues that sec.sec. 6 and 7(a) of the NLGA prohibit the issuance of a preliminary injunction against it. Section 7 limits the jurisdiction of the

federal courts to issue injunctions in cases involving or growing out of a labor dispute, and subsection (a) provides in part that "no injunction or temporary restraining order shall be issued on account of any threat or unlawful act excepting against the person or persons, association, or organization making the threat or committing the unlawful act or actually authorizing or ratifying the same after actual knowledge thereof." 29 U.S.C. sec. 107(a). Section 6 provides in part that "no association or organization participating or interested in a labor dispute shall be held responsible or liable in any court of the United States for the unlawful acts of individual offi cers, members, or agents, except upon clear proof of actual participation in, or actual authorization of, such acts, or of ratification of such acts after actual knowledge thereof." 29 U.S.C. sec. 106. In ALPA, we ruled that a carrier could not establish that a union had committed a status quo violation by means of an orchestrated "sick-out" without proving by clear and convincing evidence that the union had promoted the alleged sick-out, and that statistical evidence showing that pilots had taken twice their usual number of sick days during the relevant time period was insufficient by itself to implicate the union under this "clear proof" standard. See ALPA, 802 F.2d at 905-06. IAM argues that, even if some United mechanics were engaging in a work slowdown, United has not offered "clear proof" that IAM authorized or ratified the slowdown. IAM maintains that it had repeatedly counseled its mechanics not to engage in any job action, and that many of the "work safe" bulletins and flyers that United offered as evidence of a concerted slowdown were written not by IAM but by "strident opponents" of IAM (i.e., by mechanics or others who were sympathetic with a rival union and hostile to IAM). IAM also asserts that any "work safe" language appearing in those bulletins that it did publish meant only what it said and was intended innocently. For example, IAM claims that the "work safe" language contained in the District 141-M bulletin of October 13 was inserted in response to United's concerns regarding recent workplace accidents. Moreover, IAM contends that the increases in write-ups and other maintenance-related anomalies experienced by United could have been caused by only a "few

dissident mechanics."

We find that United has offered enough "clear proof" of IAM's involvement in the work slowdown to satisfy the standard of sec. 6. While it is true that statistics alone will not provide clear proof of a union's involvement in a work action, United did not rely on statistical evidence alone. In fact, it presented evidence of the kind that we have expressly suggested would establish a union's responsibility for authorizing or ratifying a work action under sec. 6. See ALPA, 802 F.2d at 905. United produced a number of IAM bulletins which included prominently displayed exhortations to "work safe." Moreover, United produced testimony from some of its maintenance officials that a union's suggestions to its mechanics to "work safe" or to "work by the book" are commonly recognized signals among union mechanics for a work slowdown. IAM has not challenged this testimony, and courts have found similar language to be "codes" for job actions. See, e.g., The New York Times Co. v. Newspaper & Mail Deliverers Union, 740 F. Supp. 240, 244 (S.D.N.Y. 1990) (finding that a union chapel chairman's directive to members to "adhere to strict contractual requirements in making their deliveries" was a call for a "slowdown from normal operations"); Tex. Int'l Airlines, Inc. v. Air Line Pilots Ass'n Int'l, 518 F. Supp. 203, 210-11 (S.D. Tex. 1981) (finding that council chairman's letter to union members advising them to "adhere to company policies, and contractual agreements"; "not to neglect even the most minor write ups"; . . . and "to check every item on the checklists" was sent with the understanding that pilots would interpret it as a call for a slowdown). Further, while IAM claims that it did not publish many of these bulletins, it admits to publishing some of them (for example, the District Lodge 141-M bulletin published on October 13, and the October 19 bulletin issued by Local Lodge 2294 in Indianapolis). IAM offers no satisfying explanation for why these bulletins included--indeed, trumpeted--the message to WORK SAFE! in the context of blaming United for the lack of progress in the negotiations or of criticizing United for its recent oppressive management actions. Nor does IAM explain why the language

telling mechanics to "work safe" was the only language written in bold face, underlined, or in all capital letters. While some of these bulletins also contain statements urging members not to "engage in any job action," such statements are dwarfed by the messages to "work safe," leaving the clear impression that the relatively inconspicuous statements discouraging a slowdown were not meant to be taken at face value. Given the context in which the "work safe" messages appeared and the prominent nature of their display, their obvious intent was to urge mechanics to engage in a work slowdown in response to the impasse in negotiations. In addition, given that IAM does not deny that such language can serve as a code for a slowdown, we find it difficult to believe that IAM would have included such language in the context of bulletins regarding negotiations (especially at a time when it claims that bulletins bearing the same code language were being distributed by dissident mechanics as a call for a slowdown) unless it intended to signal the mechanics to engage in a slowdown.

In addition, although it denies responsibility for their authorship, IAM does not satisfactorily explain how even more suspicious bulletins came to be distributed in three United maintenance centers in late October or early November, at least one of which was placed in a locked IAM bulletin board. These bulletins were issued under the headings "Negotiations 2000," "Millennium Negotiations," and "Lodge 1781 Strike Committee,"/12 and they each urged mechanics (in virtually identical language) to clean their boxes and tools "daily" and to "shut down and fix" anything that isn't safe, in keeping with the "safety first ideal." This is exactly the kind of evidence that we have suggested could provide "clear proof" of a union's authorization of a slowdown. See ALPA, 802 F.2d at 905 (suggesting that statistical evidence of a sickout plus, inter alia, "a notice posted on a union bulletin board" could indicate union involvement in a sickout under sec. 6) (discussing Pan American World Airways, Inc. v. Independent Union of Flight Attendants, 93 Lab.Cas. (CCH) para. 13,307, 20,035 (S.D.N.Y. July 20, 1981) (finding evidence of union

involvement in a sickout sufficient to support an injunction where, inter alia, the union did not take sufficient steps to disavow a planned sickout by its members and where an unsigned notice reporting on the negotiations and indirectly calling for the sickout was posted on a locked union bulletin board to which only the union had access)). When this evidence is considered alongside United's compelling statistical evidence, which suggests that the work slowdown began to abate just as IAM stepped up its efforts to discourage it in late November, IAM's involvement in the slowdown becomes all the more apparent. Thus, while it is not clear that the district court found that IAM had not authorized the slowdown,/13 even if it did, we would find such a finding clearly erroneous.

Finally, IAM argues that even if the NLGA did not dictate the result reached by the district court, the court nevertheless had the discretion under traditional principles of equity to deny the injunction--notwithstanding the provisions of the RLA--if it found that the injunction would not effectively provide United with the relief it sought. See, e.g., Virginian Ry. Co. v. Sys. Fed'n No. 40, 300 U.S. 515, 550 (1937). IAM contends that the district court found that the injunction would be ineffective after carefully considering the record evidence, which suggested that the TRO had been relatively ineffective in restoring the status quo and that the situation had not worsened appreciably for United once the TRO was dissolved. Therefore, IAM maintains that the district court's factual finding that the injunction would be similarly ineffective was not clearly erroneous, and must be affirmed. We reject this argument. The record does not support an inference that the injunction would be ineffective. To the contrary, the statistical evidence before the district court suggested that, while the TRO did not succeed in bringing the rates of writeups, planes held out of service, and maintenance-related cancellations and delays to historical levels, it did have a substantial positive effect after the IAM sought to implement it more aggressively. We find IAM's contention that this positive effect was due solely to United's belated

efforts to counsel and to take disciplinary action against offending mechanics unpersuasive in light of United's submissions that it did take such actions earlier, and that such actions had little effect. Moreover, even assuming that United's management efforts were partly responsible for the positive trend (which, we note, the district court did not expressly find), we find no plausible basis for the conclusion that an injunction against the union would not have an additional positive effect. Even if we were to agree that United could achieve favorable results by disciplining individual mechanics, the evidence suggests that it could achieve even more favorable results if, in addition, the injunction were in place. Given all of this, and considering that in issuing the TRO the district court found that the traditional equitable factors--including the balance of hardships and the public interest--weighed in favor of granting the injunction and that it never expressly found to the contrary, we see no equitable reason to withhold injunctive relief in this case./14

Moreover, we note that the district court did not expressly find that the injunction would be wholly ineffective. Rather, in dissolving the TRO it found that the TRO had been "somewhat ineffective," and in denying United's motion for a preliminary injunction it found merely that it would be "more effective" for United to try to resolve the problem through management. This latter finding seems to be the basis for the court's decision, and the court unfortunately provided very little support for the finding. In any event, we hold that the court misapplied the law in basing its decision on such a finding. The court concluded that some United mechanics were engaging in a work slowdown in violation of the RLA, and as we have already demonstrated, the evidence established IAM's involvement in the illegal slowdown. As we have noted, under these circumstances a court may issue an injunction against a union as the "sole, effective means" of enforcing the union to observe its obligations under the RLA's status quo provisions, and a carrier's efforts to solve the problem through management are no substitute for judicial enforcement of

the union's independent obligations. See National Airlines, Inc. v. Int'l Ass'n of Machinists and Aerospace Workers, 416 F.2d 998, 1006 n.7 (5th Cir. 1969) (stating that "[t]he primary responsibility for ending [a] strike [in violation of the RLA] rest[s] in the district court"). Therefore, by denying an injunction against IAM's illegal job action solely on the grounds that the problem could be more effectively addressed by United, the court denied United a judicial remedy to which it was entitled under the RLA and erred as a matter of law.

CONCLUSION

We have considered IAM's other arguments, and find them meritless. For the foregoing reasons, we REVERSE the decision of the district court, and REMAND with instructions to enter the preliminary injunction against IAM and to fix a date for trial on the issue of a permanent injunction in as short a time as is reasonably possible. REVERSED and REMANDED.

/1 A maintenance "write-up" is a written record by a mechanic of any item on an aircraft that may have a defect or a condition requiring further inspection or repair. Some write-ups identify serious defects that may affect airworthiness and therefore must be repaired immediately. Others involve merely trivial or cosmetic defects, such as broken tray tables or scratched paint, which can be repaired at a later time.

/2 A "cycle time" is the time that it takes to perform a scheduled maintenance check.

/3 The number of aircraft out of service for an unscheduled maintenance check is a function of two factors: the number of maintenance write-ups, and the amount of time that it takes the mechanics to repair the defects.

/4 According to an economist retained by United, the odds that the increases in cancellations and delays could be caused by random, coincidental behavior by United's mechanics were less than one in a trillion.

/5 IAM denies that any of its local lodges actually issued these bulletins or memos, and claimed that they were issued either by individual "dissident"

union members without authorization, or by other individuals who were hostile to the IAM and sympathetic to a rival union that had been gaining strength at United and that was trying to replace IAM. In his deposition, United Vice President of Line Maintenance William Norman conceded that he did not know whether they were actually published or produced by IAM lodges or union officials. Norman Dep. at 85-6.

/6 United claims that IAM posted the TRO only on their websites, that they did not direct member mechanics to cease all slowdown activity and all communications encouraging such activity upon pain of fine, suspension or other sanction by IAM, that the website bulletin that IAM did release implicitly encouraged continuation of the slowdown (by stressing the continued need for mechanics to observe all safety regulations), and that the two local lodge officers who issued notice of the TRO expressed contempt for it. For its part, IAM claims that it personally served every mechanic with a copy of the TRO within days of its issuance, that it immediately posted notice of the TRO on its website and on union-maintained bulletin boards, that its website notice did urge compliance with the TRO (and that its reference to the district court's own language stating that the TRO was not meant to impede the mechanics' compliance with safety regulations was not a signal for a further slowdown), and that Union representatives notified mechanics at stations throughout the county of the need to comply with the TRO.

/7 IAM contends that United never took any such actions until after the November 27 conference with the court. IAM claims that the November 10 letter from Studdert to Ford was the first time that United had accused IAM of encouraging a slowdown (indeed, at a meeting one week before the letter, IAM claims that United complimented IAM for "keeping the lid on," or for preventing job actions by its members during the tense negotiations). IAM also claims that United gave it specific evidence and the names of individual mechanics engaged in the slowdown only after the November 27 conference, and that IAM later discovered that almost none of those individuals had been disciplined or even counseled by United before United filed suit. United claims that it did discipline hundreds of employees (and fired some) long before filing suit, and that these efforts had little effect in curbing the slowdown until IAM finally got serious about implementing the TRO ). It also claims that it had several conversations with IAM about the problem before the Studdert letter (noting that the letter references earlier conversations between United and IAM about the slowdowns).

/8 IAM noted that mechanics who supported the rival union had called for work slowdowns and refusals to work overtime publicly and in writing immediately after United announced its plans to acquire U.S. Airways (a decision vigorously opposed by many United mechanics), and criticized IAM for refusing to do the same. Further, the mechanics supportive of the rival union staged what United believed was a "sick out" in several locations immediately after July 12. After United fired 11 of these employees, and disciplined 11 others, the sick out ended.

/9 However, when a carrier seeks to enjoin a strike against a union under the status quo provisions of the RLA, the procedural provisions of the NLGA remain in effect. See Delta Air Lines, 2001 WL 42399 at *7. For example, a carrier seeking an injunction against a union must put on live testimony with the opportunity for cross-examination, see 29 U.S.C. sec. 107, or there must at least be some equivalent guarantee of the reliability of the evidence presented. See Delta, 2001 WL 42399 at *7. However, in this case the parties stipulated to submit their case to the district court on the written record (through affidavits and briefs) without livetestimony, Dec. 13 Trans. at 4, and IAM has not raised any issue of its right to cross-examination either here or below. Thus, the issue is waived.

/10 The cases cited by IAM on this point do not compel a different conclusion. In Int'l Ass'n of Machinists v. Street, 367 U.S. 740 (1961), the Court overturned a blanket injunction brought by railway union members to enjoin their union from violating the RLA by spending funds exacted from union members on political causes, where the injunction restrained the union from collecting any funds from the objecting members. The court held that, because this injunction was overbroad (that is, because the plaintiff's rights could be effectively vindicated by a more narrowly tailored injunction) it was not the only effective remedy available, and was therefore impermissible under the NLGA. The Court remanded for the district court to impose a more narrowly tailored remedy, suggesting that a narrower injunction would be appropriate. In Chicago & North Western R.R. Co., 402 U.S. 570 (1971), the court reversed a lower court's determination that sec. 152, First was not a legal obligation enforceable against a union by injunction, and remanded for the lower court to determine whether a strike injunction sought by the carrier in that case was the "only practical, effective means" of enforcing that section of the RLA. Neither case stands for the proposition that a court must deny an injunction against an illegal work action if it

appears that the carrier could more effectively address the problem through management.

/11 We should note, however, that even if IAM had demonstrated some such action on United's part, it still might not be able to block United from obtaining the injunction it seeks. We have not read sec. 8 of the NLGA as forming an absolute bar to injunctive relief against status quo violations when the party seeking the injunction has violated either its own status quo obligations or some other legal obligation. See ALPA, 802 F.2d at 901. Rather, we have "weigh[ed] the competing equities to determine whether applying section 8's bar to injunctive relief would serve to further underlying purposes of both the RLA and the [NGLA]." In so doing, we have expressly noted that the imperatives of the RLA may override sec. 8, and that a party's lack of "clean hands" under sec. 8 "may be overcome by a balancing of the interests, particularly where it is the public interest involved." See Illinois Central R.R. Co. v. Brotherhood of R.R. Trainmen, 398 F.2d 973, 976 (7th Cir. 1968) (quotation omitted). While we do not decide the matter, we note that United could make a strong argument here that both the balancing of hardships and the public interest weigh in favor of the issuance of the injunction in this case, and that therefore the injunction could have been granted even if United had violated sec. 8 of the NLGA.

/12 The latter bulletin bore a cartoon of a wolf and stated "Wolf, play it safe, negotiate," and it purported to be from a committee that IAM claims does not exist. Third Supp. Dec. of Ford at para. 4. Steve Wolf was the former CEO of United (in the early 1990's). Id.; Dec. 13 Trans. at 43. This arguably suggests that the "wolf" bulletin was created several years ago, and not in connection with the events at issue in this case. Moreover, as IAM notes, United Vice President of Line Maintenance William Norman admitted in his deposition that he did not know whether IAM actually published this bulletin, or when it was published. Norman Dep. at 81-82. However, even assuming that this bulletin was published in the early 1990's, IAM has not explained how it came to be re-circulated in October and November of 2000, nor has it explained why a bulletin with a substantially identical message (and without any reference to Wolf) appeared simultaneously in a locked IAM bulletin board at another location.

/13 IAM claims that in dissolving the TRO, the district court found that IAM was not responsible for the alleged slowdown when it stated that the initial "allegation" that the IAM was covertlyencouraging the slowdown had "clearly been dissipated . . . ." However, read in context, this

statement seems to indicate that the district court believed that IAM was no longer encouraging the slowdown (after the TRO had been issued), not that it never had encouraged it. Some statements that the court made during the December 13 hearing on the preliminary injunction do suggest that the court believed that certain union members were engaging in a wildcat work action, "despite [IAM]'s best efforts." However, it is far from clear that the court actually made a finding on this issue.

/14 IAM argues that an injunction would not be the most effective means to "address conduct of mechanics engaged in safety sensitive work," to "address conduct that is intertwined with constitutionally protected speech," or to "address the problem of dissident mechanics." We are not persuaded. First, courts have enjoined illegal work actions undertaken under the guise of safety, see, e.g., Long Island R.R. Co. v. Sys. Fed'n No. 156, 368 F.2d 50, 52 (2d Cir. 1966), and IAM offers nothing to suggest that courts could not frame injunctive orders carefully to ensure that legitimate safety inspections are not compromised. (Indeed, the district court in this case did just that with respect to the TRO). In addition, enjoining a union from encouraging illegal job actions (or forcing it to discourage such action) during the limited period of negotiation and mediation would not intrude on constitutionally protected speech, as it would leave the union free to criticize the company's bargaining position. Finally, we reject IAM's argument that the injunction would be ineffective because the slowdown was caused by dissident mechanics, both because we find that the evidence establishes IAM's involvement, and because the statistical evidence strongly suggested that IAM's efforts to implement the TRO in late November were having an appreciable effect on the slowdown.