# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 08-4157

UNITED AIR LINES, INC.,

*Plaintiff-Appellee*,

*v.*

AIR LINE PILOTS ASSOCIATION,
INTERNATIONAL, STEVEN M. TAMKIN,
ROBERT J. DOMALESKI, JR., XAVIER F.
FERNANDEZ, and ANTHONY R.
FREEMAN,

*Defendants-Appellants*.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 08 CV 4317—**Joan Humphrey Lefkow,** *Judge.*

ARGUED FEBRUARY 24, 2009—DECIDED MARCH 9, 2009*
PUBLISHED MARCH 23, 2009

Before ROVNER, WOOD and SYKES, *Circuit Judges.*

ROVNER, *Circuit Judge.* On July 30, 2008, United Air
Lines, Inc. ("United") sued the Air Line Pilots Association,

---

* This opinion was released initially in typescript.

International ("ALPA") and several individual pilots under Section 2, First of the Railway Labor Act ("RLA"), 45 U.S.C. § 152, First, for declaratory and injunctive relief. United alleged that ALPA (which is the certified collective bargaining representative for the pilots) and the United pilots engaged in a lengthy campaign of unlawful activities to pressure United to renegotiate the parties' collective bargaining agreement ("CBA"). After conducting a hearing, the district court granted United's motion for a preliminary injunction, enjoining the defendants from "calling, permitting, instigating, authorizing, encouraging, participating in, approving or continuing any interference with United's airline operations, including but not limited to any strike, work stoppage, sickout, slowdown, work to rule campaign, concerted refusal to accept voluntary or overtime flying assignments, or other concerted refusal to perform normal pilot operations in violation of the Railway Labor Act, 45 U.S.C. § 151 *et seq.*" The court also ordered the defendants to take all reasonable actions within their power to prevent and to refrain from continuing those same actions. We granted the defendants' motion to expedite the appeal, and we now affirm.

## I.

We will provide a condensed version of the facts that are relevant to the issues on appeal. We refer the reader to the district court's extraordinarily thorough and well-supported findings of fact for a more complete picture of the case. *United Air Lines, Inc. v. Air Line Pilots Ass'n,*

2008 WL 4936847 (N.D. Ill. Nov. 17, 2008) (hereafter "*UAL*").

## A.

After the tragic events of September 11, 2001, United suffered financial losses that caused the company to file for bankruptcy in December 2002. In 2003, United and ALPA negotiated a new labor agreement (the "2003 CBA") in which the pilots made significant concessions on wages, benefits and other issues. The new agreement included a 40% wage reduction for the pilots. Over the next two years, as United's financial condition deteriorated further, the pilots agreed to additional wage reductions and termination of a defined benefit pension plan. The 2003 CBA (which included changes made in 2004 and 2005) becomes amendable on December 31, 2009, but the agreement allows the parties to begin negotiations for a new contract in early April 2009. The parties could agree to modify the contract sooner than the amendable date but neither side may unilaterally initiate negotiations until April 2009.

### 1.

United and ALPA have a long history of contentious labor relations. In 1985, the pilots engaged in a month-long strike, during which United hired permanent replacements for the striking pilots. The pilots and the company negotiated a Back-to-Work Agreement at the end of the strike, with the pilots agreeing not to retaliate against the

newly hired pilots or any pilots who crossed the picket line during the strike. In spite of the Back-to-Work Agreement, the pilots who worked during the strike were subjected to ostracism and harassment by the striking pilots for many years following the end of the strike. The harassment ranged from the juvenile (clicking a toy clicker when non-striking pilots entered a work area) to the petulant (refusing to shake hands with the non-striking pilots) to the repulsive (urinating or defecating in the flight bags of non-striking pilots). The striking pilots were both creative and persistent in their mistreatment of their non-striking counterparts, and some of the non-striking pilots eventually resigned their positions with United. The remaining United pilots came to believe that anyone who did not follow the majority position or ALPA's directives would be subjected to similar treatment. *See UAL*, 2008 WL 4936847, *5 ("The continued ostracism and harassment of non-striking pilots in the two decades following the 1985 strike created a widely-held perception among United pilots that any pilot who did not follow the majority, or ALPA, party line would be subject to similar conduct."). As we will discuss below, similar harassing conduct was directed at pilots who failed to follow ALPA directives during a 2000 work slowdown and during the current campaign.

**2.**

After United exited bankruptcy in 2006, the company began to turn a profit. United recovered even more in 2007, earning approximately $1 billion in profit in that

year. Beginning in December 2006, ALPA sought to reopen negotiations on the 2003 CBA even though it was not amendable until December 31, 2009. According to United, ALPA began to pressure United with a campaign that consisted of directives to pilots to engage in actions designed to cause flight delays and cancellations and to increase United's costs. United alleged that ALPA encouraged the pilots (a) to "fly the contract," that is, to adhere strictly to the terms of the 2003 CBA; (b) to refuse to voluntarily waive any section of the CBA, including provisions that were designated as waivable; (c) to refuse voluntary flight assignments known as "junior/senior manning"; (d) to increase fuel consumption; (e) to refuse to operate planes that had deferrable maintenance items; and (f) to take excessive amounts of time in pre-flight cockpit checks. United also alleged that, beginning in July 2008, ALPA and the four individual defendants coordinated a "sick-out" among United's junior pilots. The sick-out, in combination with the refusal to accept voluntary junior/senior manning assignments, caused several hundred flight cancellations, affecting approximately 30,000 United customers.

United filed suit on July 30, 2008. Two days later, on August 1, 2008, United and ALPA entered into a "Standstill Agreement." Under that agreement, ALPA agreed to publish statements to its pilot members directing the pilots not to engage in activities that disrupted United's operations. ALPA agreed to tell the pilots not to call in sick when they were not actually ill, and also agreed to convey to the pilots that ALPA did not condone the sick-out. ALPA also agreed in the Standstill Agreement to

publish a statement to the pilots regarding their refusal to accept junior/senior manning assignments. Those statements were released in August 2008.

**3.**

ALPA had a very efficient system in place for communicating with the pilots. A Master Executive Council ("MEC"), comprised of the top officers from local ALPA councils, has the authority for and responsibility of negotiating on behalf of the pilots. The MEC communicated with the pilots with a "MEC Update" posted on ALPA's website two or three times a week. The MEC also posts on the website statements and video presentations from the MEC chairman and other MEC entities. MEC also sends e-mails to pilots who have provided ALPA with their e-mail addresses. Approximately ninety percent of the pilots have provided their e-mail addresses to ALPA. These are not ALPA's only means of communicating with its members. ALPA also maintains a password-protected website known as the UAL MEC Forum in which ALPA members may post statements to other ALPA members. ALPA also utilizes telephone trees and text messages to distribute information to ALPA members. In other words, ALPA and the MEC have many means of communicating with the pilots, including some methods that leave no paper or electronic trail of the content.

In addition to the MEC, ALPA operates an Industrial Relations Council ("IRC"), whose purpose, according to the UAL-MEC Policy Manual, is to formulate and imple-

ment labor actions. The IRC consists of three or four members. The MEC chairman appoints the chairman of the IRC, who in turn appoints the other members of the IRC. The IRC also has methods of communicating instructions to pilots and uses the same channels through which it parcels out information to collect information. The IRC meets only in person or by telephone and by design leaves no written trail of its communications. It is a secretive organization. Steven Tamkin, one of the individual defendants, has been the chair of the IRC since 2007. Tamkin gained that position with the implicit understanding that he would take a more aggressive stance in labor relations with United than the previous chair had taken. Robert Domaleski and Xavier Fernandez, two of the other individual defendants, were also officers of the IRC. There was conflicting evidence on whether the fourth individual defendant, Anthony Freeman, was a member of the IRC.

Freeman was one of 2172 junior pilots who were furloughed following September 11, 2001. This group became known as "the 2172." Freeman maintained a password-protected website specifically for the 2172 in order to facilitate communication among the group's members and protect their common interests as junior pilots. Pilots who wish to have access to the website must be personally approved by Freeman or one of two other web administrators. The group deleted accounts of pilots who signed up with United e-mail addresses, presumably to prevent United from monitoring the group's communications. The 2172 communicated through postings on the group's website and through mass e-mails. Freeman

discouraged members from posting communications that were not "meant for paper or electronic communication." In June 2008, Freeman established a telephone tree for the group, a form of communication that would leave no readily traceable record of the content of the messages.

The district court noted that the deposition testimony of the four individual defendants varied on whether Freeman is or ever was a member of the IRC. The testimony also varied on when the defendants were appointed to the IRC and by whom they were appointed. These significant discrepancies in the testimony caught the attention of the district court because the four individual defendants held a meeting on June 11, 2008, shortly before a July sick-out staged by the junior pilots began, and the subject of that meeting was much disputed. The court found that the discrepancies were material and "cast doubt on the candor" of the deposition testimony of these defendants. Tamkin and Freeman testified that Freeman was a member of the IRC; Domaleski and Fernandez testified that Freeman was not a member of the IRC. The court specifically noted that "[i]f Freeman was not a member of the IRC, it would have been difficult for defendants to provide an innocent explanation as to why he met with the IRC members on June 11, 2008."

The court found the discrepancies about the timing of the defendants' appointments to the IRC material because the IRC had been disbanded in 2000 and was reactivated either during the current MEC chairman's tenure or during the tenure of his predecessor. The current MEC chairman, Steven Wallach, was elected in October 2007 and formally took office in January 2008.

Former MEC chairman Mark Bathurst stepped down at that time. Tamkin claimed to have been appointed by Bathurst in April 2007, and testified that he appointed Domaleski, Fernandez, and Freeman in April 2007. Domaleski testified that he, Tamkin and Fernandez were appointed in approximately November 2007 by the newly elected MEC Chairman Wallach. Fernandez claimed that he, Tamkin, and Domaleski were appointed in May 2007. The court found that the inconsistencies in these dates could reflect an effort by Tamkin, a friend of Wallach, to place responsibility for reactivating the IRC on Bathurst rather than on Wallach. United argued vigorously in the district court that these discrepancies cast serious doubt on the credibility of the four individual defendants. Yet at the time of the hearing and in briefing, ALPA and the individual defendants made no effort to explain the discrepancies. The district court concluded that Freeman was not a member of the IRC and that those who attended the June 11, 2008 meeting were "less than candid" about what occurred at that gathering.

**4.**

ALPA used the 2000 slowdown as an example to the pilots during the current dispute. The pilots engaged in a work slowdown during negotiations that year for a new contract. When a new agreement was not reached before the amendable date of the prior agreement, ALPA used the IRC to implement a slowdown campaign. ALPA directed the pilots, through the IRC, to decline voluntary overtime assignments and to refuse to waive any provi-

sions of the contract. In the summer of 2000, United experienced a dramatic increase in flight delays and cancellations due to decisions by pilots to refuse to fly aircraft with minor equipment issues and due to delays in completing pre-flight checklists. During that time, ALPA publications encouraged pilots to "fly the contract," a code phrase for strict adherence to the contract in order to pressure United to make concessions in the new CBA. ALPA also encouraged pilots to confront any colleagues who were not following ALPA's directives. During the summer of 2000, pilots who did not comply with ALPA's instructions had their names posted on bulletin boards along with derogatory comments about them, and they received harassing phone calls at home. The day after United agreed to large wage increases in the 2000 CBA, flight delays and cancellations returned to near-normal levels.

ALPA used this history and the pilots' knowledge of this earlier dispute to encourage the 2007 practices. For example, in April 2007, ALPA released a video message telling the pilots that if they had any doubts about what leverage is and what it could accomplish, they should talk to pilots who remembered prior negotiations. In September 2007, Wallach told the pilots that the 2000 CBA was obtained by pilots "forcing the company to negotiate." Wallach also said that the pilots had to make it more expensive for the company not to negotiate than to negotiate. As late as June 2008, a MEC member sent an e-mail to other MEC members reminding them that "[i]n 2000, we brought our CEO to his knees" because United was delaying reaching a new contract, and that he was prepared to increase his "level of risk."

ALPA's actions and communications to pilots in the current job action were very similar to ALPA's approach during the 2000 work slowdown, and the harassment of non-cooperating pilots also followed the same pattern. Because 90% of the current pilots were employed by United in 2000, the district court inferred that the current pilots understood how the elements of a job slowdown would be implemented, understood what ALPA meant when it used coded phrases like "fly the contract," knew that they would likely be harassed by their fellow pilots if they failed to comply with ALPA's directives, and believed that, based on their prior experience, a slowdown campaign would create the leverage they wanted to give them an advantage at the bargaining table.

**5.**

The job action that began in 2006 escalated in 2008. In 2008, United faced substantial increases in the price of jet fuel, resulting in a $2.7 billion net loss in the first six months of 2008. On June 4, 2008, United announced plans to retire approximately 100 aircraft and to furlough 1450 pilots. The vast majority of the furloughed pilots were expected to be the same pilots who had been furloughed after September 11, 2001. In other words, most of the furloughed pilots would be part of the 2172. A week later, on June 11, 2008, the four individual defendants met. Recall that three of the individual defendants were indisputably members of the newly reformulated IRC and the fourth was Freeman, a member of the 2172

who had launched the 2172 website. A month after that meeting, the junior pilots who were expected to be furloughed began a sick-out that resulted in several hundred flight cancellations. United had expected that this group of pilots would try to use some of their sick leave before being furloughed, but the levels exceeded expectations, and when combined with other actions, such as refusals to take on junior/senior manning assignments, caused substantial disruptions in service at United.

In 2006, the then-MEC Chairman Bathurst had announced the "Fix it Now" campaign, which became more aggressive when the new MEC Chairman, Wallach, was appointed. Both MEC chairmen tied the success of ALPA's efforts to reopen the 2003 CBA to actions by pilots to create leverage. ALPA directed the pilots to decline to fly aircraft that had deferrable maintenance (the "Fix it Now" campaign), to "fly the contract" (that is, to strictly adhere to the contract terms for the purpose of causing a slowdown), and to "work-to-rule" (another code for the pilots to strictly adhere to contract terms for the purpose of creating delays and cancellations). In January 2007, United agreed to meet ALPA to discuss modifying certain work rules if the changes could be effected on a cost-neutral basis. By the middle of March 2007, the parties reached a tentative agreement on some of these issues. Although the MEC approved the tentative agreement, ALPA's members did not, and the deal fell through. Bathurst released a video in April 2007, addressing the failed agreement, the "Fix it Now" campaign and the group's plans to pursue a more aggressive posture in seeking to modify the 2003 CBA. United's

management immediately noticed a slowdown following the release of the video, and raised the issue with the MEC chairmen in May 2007 and January 2008. Neither MEC chairman would admit that a job action was underway and ALPA took no action in response to United's requests. United continued to offer to address specific concerns, and also increased its pool of reserve pilots so that the company would be less dependent on junior/senior manning during pilot absences.

On July 14, 2008, MEC Chairman Wallach directed ALPA to terminate negotiations with United regarding certain quality of life issues, and the sick-out began. On July 21, 2008, after United requested assistance in ending the sick-out, Wallach sent a letter to the pilots regarding the increase in sick leave. The district court found that, "[o]n its face, the letter could not reasonably have been interpreted by United pilots as discouraging the sick-out." *UAL*, 2008 WL 4936847, *34. The letter contained only two sentences indicating that the MEC did not condone the inappropriate use of sick leave, and that sick leave should only be used for purposes approved in the contract or as required by law. The court found that the remainder of the letter assured pilots that they were "absolutely entitled to use sick leave for appropriate circumstances." The next eight paragraphs included "lengthy lists of the myriad situations in which a pilot may or must take sick leave—including a wide variety of medical reasons, as well as various non-medical situations, such as fatigue, stress, and emotionally upsetting events." *Id*. Not entirely unexpectedly, sick leave did not substantially decrease following this letter. As we

noted above, United filed suit approximately one week later, the parties entered into the Standstill Agreement, and United sought injunctive relief.

### 6.

The district court concluded that ALPA had ordered a number of job actions focused on exerting financial pressure on United to force the company to reopen negotiations on the 2003 CBA before the amendable date required United to do so. In 2006, in addition to the Fix it Now campaign, the MEC chairman reactivated the MEC's Strike Preparedness Committee ("SPC"), which had been inactive for approximately five years. At the time the SPC was reactivated, ALPA could not lawfully strike for at least three more years under the CBA. ALPA and the MEC chairmen issued statements and video-taped messages to the pilots employing phrases like "fly the contract" and "work-to-rule," which the pilots understood from prior job actions as directives to engage in a slowdown. ALPA leadership also told the pilots it was not in their interest to waive any contract provisions, and in April 2007, the MEC chairman specifically discouraged the pilots from taking junior/senior manning assignments. Immediately after this statement, United noticed a substantial drop in the number of pilots willing to take these assignments. When United management approached ALPA to discuss this drop-off and also to discuss the posting of "rat lists" naming pilots who took junior/senior manning assignments, ALPA claimed it had no involvement in any harassment and told the

company to take care of these issues through the normal discipline process. ALPA did not address the complaint about the drop-off in junior/senior manning. During the remainder of 2007, United and the pilots reached agreements on a number of smaller issues of concern to the pilots.

Before Wallach began his formal term as chairman of the MEC, he asked United's management to start negotiations before the April 2009 date contained in the 2003 CBA. United asked to meet with Wallach and told him the company was contemplating a merger. United asked Wallach if they could defer discussions about reopening the contract until the merger discussions were complete. Wallach agreed to do so if United would implement the failed tentative agreement from March 2007. United, hoping to stop the slowdown, agreed to implement that agreement if Wallach would "take the customer out of" the equation, that is, if ALPA would stop engaging in actions that affected service to customers. Wallach agreed to do so, and did stop certain picketing at corporate and institutional customers, but did not halt the slowdown campaign. Indeed, after Wallach became the MEC chairman in January 2008, the district court found that ALPA began a more aggressive campaign to reopen the contract. During his campaign to be elected MEC chairman, Wallach advocated attacking the labor laws in Congress, and told the pilots that, although ALPA could not tell pilots specifically what to do, it could tell pilots to strictly abide by the flight operations manual and the contract. Wallach also told the pilots he did not consider the illegality of slowdowns under the RLA to be a

serious impediment, telling his audience, "You should use lawyers to get you out of jail when you do what you need to do." On his first day in office, Wallach exhorted the pilots to "take back our airline and reclaim what was stolen from us" during the bankruptcy negotiations. The MEC Updates issued under Wallach repeatedly reminded the pilots that they were working under a contract negotiated under the duress of the bankruptcy.

In February 2008, United met again with Wallach and presented him with statistical evidence regarding operational delays. United asked for Wallach's help in eliminating service disruptions. But operational problems did not improve after this meeting. And once United finished merger discussions in April 2008 (the merger never happened), Wallach resumed the picketing he had earlier halted. That same month, United and ALPA agreed to jointly address fatigue issues for pilots. In May 2008, the parties began to negotiate work rules related to fatigue and "quality of work life" issues. Wallach told United management that there would be consequences if no agreement was reached on these issues by the end of May. Although Wallach did not describe the consequences, United understood this to be a threat that ALPA would intensify its disruption of United's operations during the busy summer months. On June 4, 2008, United announced its intention to reduce the fleet by 100 aircraft and to furlough 1450 pilots. As a result of this announcement, the parties agreed to turn their attention to negotiating a furlough agreement. ALPA and United reached a furlough agreement in late June, which the MEC approved on July 11.

In the meantime, in late June, Wallach convened a closed-door meeting of the MEC, the IRC, the SPC and the Family Awareness Committee (a subcommittee of the SPC). E-mail chatter preceding this meeting suggested that some MEC members wanted to "ratchet up the heat" and bring the United CEO "to his knees." A few days after the meeting, Wallach sent to United management a draft letter that he intended to send to the pilots. He told United to "stick it [presumably, the draft letter] in their decision matrix" on the fatigue negotiations. The letter attacked the competence and motives of United's management and suggested that United did not care about the fatigue negotiations. Wallach delivered a revised version of this letter to the pilots on July 15, 2008. In the revised letter, Wallach told the pilots that ALPA was terminating negotiations with United on the fatigue and other "quality of work life" issues. Wallach painted United's management as "a focused, hostile and arrogant management group" that did not care about the well-being of the pilots or their families. The letter told the pilots that they could not get out from under the 2003 CBA unless they started to work on it "now," meaning in July, a full eight and a half months before the 2003 CBA allowed for negotiations to begin. Wallach later testified that he decided to terminate negotiations because they were "out of time" and "done talking." The district court questioned this explanation because there was no apparent time constraint, and the only alternative to continuing negotiations was to engage in a more widespread (and unlawful) job action. In contrast to Wallach and ALPA's representations, the district court found that

United was making progress toward a fatigue agreement, and that the company sent a revised proposal to ALPA which United believed would resolve the only remaining open issue. ALPA never replied to this proposal.

Based on this and other evidence, the district court found that the true reason for sending the July 15 letter to the pilots was to foster indignation and animosity towards United, and to encourage the pilots to engage in more widespread job actions on the premise that United would not agree to ALPA's proposals. At Wallach's direction, ALPA also withdrew from an agreement the parties reached in September 2007 regarding a web-based trip trading program that the pilots wanted. Withdrawing from that agreement created a burden on pilots who wanted to trade trips and provided nothing to ALPA in return. In other words, ALPA took a step against the pilots' interests, cancelling an agreement in favor of the pilots, for no apparent reason. The district court found this to be further evidence that Wallach and ALPA were trying to create animosity among the pilots toward United.

### 7.

The district court found that ALPA's current campaign to force United to renegotiate the CBA mirrored the tactics ALPA employed in the 2000 slowdown. The court found that the current campaign included refusals to accept voluntary flight assignments such as junior/senior manning; refusals to waive contract provisions that pilots normally would be willing to waive; creation of flight delays with lengthy pre-flight cockpit checks; the unneces-

sary addition of extra fuel to flights; and the creation of flight delays and cancellations by refusing to fly aircraft with deferrable maintenance items. The court found that ALPA and the IRC encouraged a sick-out among the junior pilots which, combined with the refusal to accept junior/senior manning assignments, caused several hundred flight cancellations. Although ALPA claimed that the letter to the pilots on July 21, 2008 was intended to discourage the pilots from using sick leave inappropriately, the court found that the vast majority of the letter actually encouraged the use of sick leave, and that the pilots receiving the letter would have understood it as an invitation to ramp up sick leave. Indeed, after the pilots received the letter, the use of sick leave increased. The court found that there was also an extraordinary increase in fatigue calls during the relevant time. Pilots may call off work on any given day if they believe they are too fatigued to fly. This is a safety-based, no-questions-asked policy. During the time in question, there was a multifaceted education program about fatigue-related safety issues. The pilots received messages about fatigue from United, the FAA, and the airline industry as well as from ALPA and the IRC. The court found that it was impossible to discern to what extent the increase in fatigue calls was due to illegitimate efforts by ALPA and the IRC. The court therefore rejected United's argument that the increase in fatigue calls was part of any unlawful job action. The district court's findings on all of these issues are well-supported by the record and by the court's careful analysis, and we affirm those findings.

The court also found that ALPA exerted such extra-ordinary control over the pilots that it could direct whether the pilots were going to wear their hats on certain days. MEC Updates included a graphic of a light switch. When the switch was in the "on" position, pilots were to wear their hats, and when the switch was in the "off" position pilots were to keep their hats off. This exercise in solidarity and control over the pilots was enormously successful, and some pilots who wore their hats during "off" periods were threatened with physical violence by other pilots. The court found additional evidence of ALPA's ability to control the actions of the pilots, including the immediate success of the Standstill Agreement in dramatically reducing the use of sick leave. Unlike the counterproductive July 21, 2008 letter, ALPA was able to convey to the pilots that, this time, it really meant it.

Moreover, pilots who did not comply with ALPA's directives on junior/senior manning found themselves the subjects of harassment that included "rat lists"; derogatory and threatening notes at work and at home; graphically violent horror movies delivered to their homes; unauthorized loans taken out in their names; magazine subscriptions taken out in their names; and harassing phone calls to the pilots, their spouses and (most appallingly) their children at home. Although ALPA denied that it supported the harassment, the court concluded from the evidence that ALPA ratified and possibly authorized this harassment, and that ALPA knew about the harassment and failed to take any meaningful action to discourage it. The harassment was the mechanism by which ALPA

was able to exert control over the pilots. These findings are also well-supported by the record and we affirm them.

**B.**

We refer the reader again to the district court's exhaustive opinion for the court's conclusions of law. *UAL*, 2008 WL 4936847, *35-*47. In a nutshell, the court found that ALPA and the individual defendants violated Section 2, First of the RLA by directing and encouraging the pilots (1) to refuse junior/senior manning assignments; (2) to refuse to waive contract provisions; (3) to "fly the contract" and engage in conduct that would increase flight delays, cancellations and costs to United; and (4) to engage in a sick-out (especially among the junior pilots) beginning in July 2008. The court also found that ALPA violated its duty to exert every reasonable effort to stop the disruption of United's operations and to stop the harassment of pilots who did not cooperate with ALPA's directives. The court found that the defendants engaged in these activities for the purpose of obtaining a new CBA. The court concluded that this was not a "minor dispute" under the RLA, and that the court had jurisdiction to enforce Section 2, First of the RLA under these circumstances. United's claims were not barred by the six-month statute of limitations contained in the RLA, the court determined, because the defendants were engaged in a multi-faceted, ongoing slowdown campaign that constituted a continuing violation of the RLA. The court also held that United's claims were not barred by laches.

The court held that the Norris-LaGuardia Act ("NLGA"), 29 U.S.C. § 101 *et seq.*, does not prohibit the issuance of a

preliminary injunction in these circumstances. Although the NLGA generally strips courts of jurisdiction to enter injunctions against labor unions in labor disputes, the court noted that, where a challenged action violates a specific provision of the RLA, the RLA takes precedence over the NLGA. Under Section 7(a) of the NLGA, the court acknowledged it could not enter an injunction unless the court found that unlawful acts have been threatened and will be committed unless restrained or have been committed and will be continued unless restrained. The court rejected ALPA's claim that United is no longer suffering operational problems, and that the lawsuit and ALPA's subsequent actions have been adequate to address the operational problems. The court found no support in the record for those contentions. Nor was the court persuaded that the Standstill Agreement or the defendants' voluntary cessation of certain activities negated the need for an injunction. Based on the record we described above, the court believed that the defendants would continue to engage in unlawful conduct to disrupt United's operations unless an injunction was entered. In balancing the four factors for a preliminary injunction, the court found that United had demonstrated a likelihood of success on the merits, that the company had no adequate remedy at law, that the balance of hardships weighed in United's favor, and that the public interest also weighed in favor of United. The court therefore granted the preliminary injunction, and the defendants have appealed.

**II.**

The defendants raise four main issues in this expedited appeal. First, they contend that the six-month statute of limitations bars United's claim that ALPA engaged in an unlawful job action. Second, they argue that ALPA has made reasonable efforts under Section 2, First of the RLA in response to the alleged sick-out. Third, they contend that United has not satisfied the requirements of Section 6 of the NLGA Act because the company failed to show that the defendants participated in or ratified any unlawful acts. Finally, the defendants maintain that the requirements of Section 7 of the NLGA were not satisfied here, and that an injunction was not necessary to prevent a violation of Section 2, First of the RLA. We review the district court's findings of fact for clear error, its balancing of the factors for a preliminary injunction under the abuse of discretion standard, and its legal conclusions *de novo*. *United Air Lines, Inc. v. Int'l Ass'n of Machinist & Aerospace Workers*, 243 F.3d 349, 360 (7th Cir. 2001) ("*IAM*").

**A.**

Because the RLA has no statute of limitations for actions under Section 2, First, we borrow the six-month statute of limitations from section 10(b) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 160(b). *See West v. Conrail*, 481 U.S. 35, 37-38 (1987); *Brotherhood of Locomotive Eng'rs v. Atchison, Topeka & Sante Fe Ry. Co.*, 768 F.2d 914, 919 (7th Cir. 1985). The defendants contend that United was aware of the job actions in dispute here as

much as eighteen months before the company filed this suit on July 30, 2008. Specifically, the defendants posit that United was aware of the problems with junior/senior manning in 2006, and knew about ALPA's other actions (refusals to waive the contract, delays and cancellations due to refusals to fly aircraft with deferrable maintenance, the use of excessive amounts of fuel, for example) in 2006 and 2007. Because United did not file suit until more than six months after those actions commenced, the defendants maintain that the suit is untimely.

As the district court noted, the defendants' actions were not discrete acts that occurred outside the period of limitations. Rather, the actions were a "multi-faceted and ongoing slowdown campaign" that violated the RLA outside of the limitations period and continued to occur and continued to cause new harm during the limitations period. The court found that the directives by ALPA to the pilots, and the pilots' actions to disrupt United's operations continued well into the six-month period prior to the filing of the lawsuit. In fact, the court noted, the continuing campaign against junior/senior manning contributed to the large number of flight cancellations at the height of the sick-out campaign in July 2008, weeks before United filed suit. The court looked to cases interpreting Section 10(b) of the NLRA (from which we borrowed the statute of limitations), and found that when a violation begins outside the period of limitations but continues into the limitations period, the claim is not time barred. *See Atlas Air, Inc. v. Air Line Pilots Ass'n*, 232 F.3d 218, 226-27 (D.C. Cir. 2000) (under the RLA, as in the NLRA, suits for unlawful actions which begin before

the limitations period but continue during the limitations period and continue to cause injury during the limitations period are not time barred). As the Ninth Circuit explained:

> A party may not rely solely on events occurring more than six months before suit was filed to establish a violation of the RLA. However, events occurring outside the limitations period may be proven to shed light on the true character of matters occurring within the limitations period, if evidence exists that is reasonably substantial in its own right that the violation of the RLA upon which the plaintiff relies occurred within the period. The evidence of events within the limitations period, considered apart from earlier evidence which may help to explain the events in question, need not be conclusive; significant or considerable evidence that a violation occurred within the limitations period will suffice.

*Association of Flight Attendants, AFL-CIO v. Horizon Air Indus., Inc.*, 976 F.2d 541, 547-48 (9th Cir. 1992) (internal citations and quotation marks omitted). *See also Local Lodge No. 1424 v. NLRB*, 362 U.S. 411, 416 (1960) (interpreting section 10(b) of the NLRA, and holding that, when occurrences within the six-month limitations period in and of themselves may constitute, as a substantive matter, unfair labor practices, earlier events may be utilized to shed light on the true character of matters occurring within the limitations period).

Here the district court clearly found that, during the limitations period, the defendants were engaged in unlaw-

ful job actions that caused harm to United's operations. In addition, the full effect of actions that began before the limitations period was not felt until ALPA initiated additional actions during the limitations period. For example, the ongoing campaign to refuse junior/senior manning assignments, which began in 2006, combined with the junior pilot sick-out in July 2008 to force hundreds of flight cancellations. Neither action alone would have produced the same magnitude of harm as those actions did together; it was the combination of refusals to accept overtime assignments combined with a large number of pilots calling in sick that caused the cancellations. This fact alone distinguishes this case from *Limestone Dev. Corp. v. Village of Lemont*, 520 F.3d 797 (7th Cir. 2008), and *Lewis v. City of Chicago*, 528 F.3d 488 (7th Cir. 2008), which the defendants characterize as irreconcilable with *Atlas Air*. In each of those cases, the wrongful acts and the injuries were completed outside the limitations period, although "lingering effects" of the wrongful actions were alleged. In the instant case, the defendants engaged in unlawful actions before and during the limitations period that caused injuries before and during the limitations period. The earlier actions shed light on the actions within the limitations period. And the earlier actions that continued into the limitations period combined with actions well within the period to create new injuries. United's action is not time barred.

**B.**

We can dispense quickly with the defendants' second argument; it has no merit. The defendants argue that

ALPA made reasonable efforts under Section 2, First to halt the alleged sick-out. Citing our *IAM* opinion, they contend that the court may not issue a preliminary injunction against a union that has promoted improper activity if the union has taken sufficient steps to attempt to end that activity. They cite ALPA's July 21, 2008 letter to the pilots as a reasonable attempt to end the sick-out. But the district court found that this letter contained only a few sentences addressed to ending the unlawful sick-out and was mostly composed of coded encouragements to continue and even ramp up the sick-out. As the court noted, the sick-out continued and even increased in intensity following the letter. Yet after the lawsuit was filed and the parties entered into the Standstill Agreement, ALPA managed to find a way to communicate to the pilots that they should back off of the sick-out. The July 21 letter was surprisingly ineffective even though ALPA was able to control the pilots at such a level of minutiae that it could direct when the pilots would wear their hats. The court did not err when it concluded that ALPA had not engaged in a good faith effort to end the sick-out when it sent the July 21 letter. Rather, ALPA sent the pilots a letter that the pilots would understand to be an invitation to continue the sick-out. ALPA's argument on this point consists mostly of a request for this court to reweigh the evidence and to consider again the district court's credibility findings. We accord substantial deference to the district court's findings of fact, and the defendants do not come close to demonstrating clear error here. *IAM*, 243 F.3d at 360-61.

## C.

The defendants acknowledge that a court may issue an injunction to enforce the requirements of Section 2, First of the RLA. But they contend that the requirements of Section 6 of the NLGA must also be met before an injunction may issue, and that those requirements were not met here. Section 6 of the NLGA provides:

> No officer or member of any association or organization, and no association or organization participating or interested in a labor dispute, shall be held responsible or liable in any court of the United States for the unlawful acts of individual officers, members, or agents, except upon clear proof of actual participation in, or actual authorization of, such acts, or of ratification of such acts after actual knowledge thereof.

29 U.S.C. § 106. The defendants assert that Section 6 requires United to provide clear proof that the defendants participated in, authorized, or ratified the job actions at issue here. United disputes whether the clear proof standard applies in the context of injunctive relief, maintaining that it applies only to claims for damages or criminal liability. In *IAM*, we assumed without expressly deciding that Section 6 applied to claims for injunctive relief. *IAM*, 243 F.3d at 365-67. *See also Air Line Pilots Ass'n v. United Air Lines, Inc.*, 802 F.2d 886, 905 (7th Cir. 1986) (hereafter "*ALPA*") (in order to establish that Section 6 does not insulate a union against an injunction, the employer was required to show by "clear proof" the union's involvement with sick leave abuse). We need not revisit the use of the clear proof standard in this case because

United still prevails under the higher clear proof standard, which requires "clear and convincing evidence, as opposed to a preponderance." *ALPA*, 802 F.2d at 905.

The defendants argue that the district court clearly erred in finding clear proof that (1) the pilots engaged in a slowdown in 2008; (2) the pilots engaged in a sick-out in June and July of 2008; (3) ALPA and the individual defendants authorized or ratified messages posted on the MEC Forum or the website for the 2172; (4) the individual defendants who were members of the IRC instigated a sick-out; and (5) ALPA's July 15 letter from Wallach was intended to foster indignation and animosity among the pilots toward United, and thus encourage them to engage in more widespread job actions. The defendants counter these findings by explaining that (1) any increase in delays and cancellations can be explained by "the most challenging operating environment in aviation history" that occurred in 2008; (2) any increase in sick leave usage was not the result of a concerted sick-out but rather was the expected result of United's announcement that it intended to retire 100 aircraft and furlough 1450 pilots; (3) there was no evidence that ALPA or the individual defendants authorized or ratified the messages posted on the MEC Forum or the 2172 website; (4) the individual defendants actually tried to prevent the sick-out in the June 11 meeting; and (5) there was nothing unlawful about the July 15 letter and no evidence that any pilots called in sick as a result of that letter.

We note again that we owe great deference to the district court's findings of fact and will reverse them only

for clear error. *IAM*, 243 F.3d at 360-61. In *ALPA*, we found that statistical evidence alone regarding a marked increase in sick leave was not enough to constitute clear proof that the union was implicated in a sick-out scheme. 802 F.2d at 905-06. *See also IAM*, 243 F.3d at 366 (reiterating that statistical evidence alone is not enough to provide clear proof of a union's involvement in a work action). An employer may meet the clear proof standard with statistical evidence in combination with evidence of a union's coded communications to its members to engage in an unlawful job action. Phrases such as "work safe," "work by the book," "adhere to strict contractual requirements," "not to neglect even the most minor write ups," "check every item on the checklists," were all recognized as coded signals to engage in a slow-down. 243 F.3d at 366-67. In *ALPA*, we suggested that statistical evidence plus a notice posted on a union's bulletin board could suffice as clear proof. 802 F.2d at 367. In *IAM*, we found that the union's directives to workers to "work safe," to clean their boxes and tools daily, and to shut down and fix anything that is not safe, combined with statistical evidence, were clear proof of a union's authorization of a slowdown. 243 F.3d at 367.

With those standards in mind, we turn to the evidence on which the district court relied in finding that United had clearly proved the defendants' involvement in various job actions. First, the court relied on statistical evidence regarding increases in the use of sick leave, in refusals to accept junior/senior manning assignments, and in flight delays and cancellations. Second, and more importantly, the court also relied on the many messages

that the defendants conveyed to the pilots during the relevant time frame. Among those messages were repeated directives to "fly the contract," to not waive any part of the contract, to decline junior/senior manning assignments, to "fix it now," and to "work-to-rule." Some of these directives appeared on websites and in mass e-mails, the twenty-first-century equivalents of a bulletin board. Some communications occurred through channels that were decidedly less traceable such as phone trees. The court based its conclusions that the pilots understood these to be coded phrases to engage in job actions on prior disputes between the company and the pilots where similar phrases were employed, finding those prior disputes relevant because so many of the pilots involved in the earlier actions were still on the job. Other evidence before the court included the July 15, 2008 letter that the court determined was designed to increase indignation and animosity among the pilots toward the company. We will not repeat the district court's complete findings. We affirm those findings because, contrary to the defendants' contentions, the court relied on a wealth of evidence in rejecting the defendants' alternative explanations for the increases in sick leave usage, and flight delays and cancellations.

We addressed above the appropriateness of the district court's findings regarding the July 21, 2008 letter related to sick leave usage. The defendants also complain that the court erred by drawing a negative inference from the failure of the individual defendants to testify at the hearing regarding the June 11, 2008 meeting regarding the sick-out. The defendants, however, have mischaracterized

the court's analysis. The court found that there were material inconsistencies in the deposition testimony of the four individual defendants regarding the composition of the IRC, the timing of their appointments to the IRC, and the content of the June 11 meeting. From those inconsistencies alone the court concluded that the defendants were not candid in their claims about the June 11 meeting or the composition of the IRC. The court was merely noting that the defendants had an opportunity to clarify the inconsistencies and did not. In the absence of any explanation, the court adhered to its view that the individual defendants lacked credibility in their deposition testimony. There was nothing inappropriate in drawing that inference and adhering to it in the absence of any evidence to the contrary.

As for the July 15 letter, the court was correct to consider its content and tone in relation to all of the other evidence about the job actions. The letter used inflammatory language and informed the pilots that it was necessary to begin working on a new CBA "now," more than eight months before the 2003 CBA allowed for negotiations to begin. In the context of everything else that was going on at the time, the July 15 letter was one more piece of evidence that the increased sick leave, and flight delays and cancellations were not coincidental and could not be explained by the challenging operating conditions faced by the company. The district court did not err in finding that United clearly proved that the defendants authorized and/or ratified the unlawful job actions.

**D.**

Finally, the defendants argue that the district court erred in finding the requirements of Section 7 of the NLGA satisfied, contending that the injunction was not necessary to prevent a violation of Section 2, First of the RLA. The RLA, the starting point of our analysis, was enacted, in part, to avoid interruptions to commerce or to the operation of carriers engaged in commerce. *See* 45 U.S.C. § 151a. The RLA seeks to encourage collective bargaining and to avoid wasteful strikes and interruptions of interstate commerce. *IAM*, 243 F.3d at 361; *ALPA*, 802 F.2d at 895. In order to accomplish this goal, Section 2, First of the RLA imposes on both management and labor a duty to "exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes . . . in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof." 45 U.S.C. § 152. The Supreme Court has characterized this duty as the heart of the RLA. *See Brotherhood of R.R. Trainmen v. Jacksonville Terminal Co.*, 394 U.S. 369, 377-78 (1969). During all labor negotiations, the parties are obliged under the RLA to maintain the status quo with respect to pay, work rules and working conditions. *IAM*, 243 F.3d at 361-62. If either management or labor engages in conduct that violates the RLA, a court may enjoin the unlawful activity. *IAM*, 243 F.3d at 362.

But when a carrier is seeking to enjoin the activities of a union, "a court must look not only to the RLA but also to

the NLGA to determine whether the court has jurisdiction." *IAM*, 243 F.3d at 362 (quoting *Delta Air Lines, Inc. v. Air Line Pilots Ass'n*, 238 F.3d 1300, 1305 (11th Cir. 2001)). As a general rule, the NLGA strips courts of jurisdiction to enter injunctions against labor unions in cases growing out of labor disputes. Section 7 of the NLGA provides, in relevant part:

> No court of the United States shall have jurisdiction to issue a temporary or permanent injunction in any case involving or growing out of a labor dispute, as defined in this chapter, except after hearing the testimony of witnesses in open court (with opportunity for cross-examination) in support of the allegations of a complaint made under oath, and testimony in opposition thereto, if offered, and except after findings of fact by the court, to the effect--

> (a) That unlawful acts have been threatened and will be committed unless restrained or have been committed and will be continued unless restrained, but no injunction or temporary restraining order shall be issued on account of any threat or unlawful act excepting against the person or persons, association, or organization making the threat or committing the unlawful act or actually authorizing or ratifying the same after actual knowledge thereof;

29 U.S.C. § 107. Reading the RLA and the NLGA together, the Supreme Court has held that when a challenged action violates a specific provision of the RLA (such as the status quo provisions), the court may enter an injunction against a union using the standards set forth in the NLGA.

*Pittsburgh & Lake Erie R.R. Co. v. Ry. Labor Executives' Ass'n*, 491 U.S. 490, 513 (1989); *IAM*, 243 F.3d at 362.

As we stated in *IAM*, "the Court has carved out an exception from the NLGA's general prohibition on injunctive relief against union activity for violations of specific provisions of the RLA." 243 F.3d at 362. However, "this exception is a limited one which applies only if an injunction is the only, practical, effective means of enforcing the duty to exert every reasonable effort to make and maintain agreements, or if that remedy alone can effectively guard the plaintiff's right." *IAM*, 243 F.3d at 362-63 (internal citations and quotation marks omitted). *See also Burlington Northern & Santa Fe Ry. Co. v. Brotherhood of Locomotive Eng'rs*, 367 F.3d 675, 679 (7th Cir. 2004) (where there are other effective means available to ensure compliance with the provisions of the RLA, an injunction should not issue).

The defendants contend that the district court erred in finding that the NLGA did not bar the issuance of an injunction here. According to the defendants, United did not meet its burden of demonstrating that any unlawful activity would continue in the absence of an injunction. The defendants assert that the district court committed an error of law when it reversed the burden and required that the defendants demonstrate that their unlawful conduct had ceased. The defendants maintain that United presented no evidence that the company continued to suffer operational difficulties after the parties entered into the Standstill Agreement. With the Standstill Agreement in place, the defendants argue, there was no need to

enter the injunction. At oral argument, we asked the defendants whether it was ever appropriate to enter a preliminary injunction once a union had signed a "standstill agreement." The defendants said an injunction would be appropriate at that point only if there was also evidence that the union's subsequent actions and statements were not consistent with the standstill agreement.

In this case, the district court in fact found that the defendants' subsequent actions and statements were not consistent with the Standstill Agreement. Although some of the job actions declined following the Standstill Agreement, some then increased again after the initial decline. For example, although sick leave usage initially declined following the signing of the Standstill Agreement, it then increased, albeit not to prior levels. And the post-Standstill sick leave usage, although lessened from the peak of the sick-out, continued to greatly exceed expected levels of usage. The pilots also continued to refuse junior/senior manning assignments at greatly reduced rates following the Standstill Agreement. The district court was also aware that the promises made in the Standstill Agreement were not made in a vacuum. The court considered the history of ALPA's actions in this dispute and in prior labor disputes. During those disputes, as well as the current one, ALPA exerted great control over the pilots. The pilots were aware that they would face harassment and ostracism if they failed to follow ALPA's directives. During the current dispute, when United asked for ALPA's assistance in curbing the sick-out, ALPA sent out a letter that, with a wink and a nod, actually resulted in an increase in sick leave. ALPA continues to insist that the

July 21 letter was a good faith effort to end the sick-out. The district court was entitled to conclude that only an injunction would put a halt to the unlawful actions in light of that continued insistence. Only when faced with the litigation did ALPA accede to the Standstill Agreement and issue a directive that had any real effect on lowering sick leave usage. Even then, it did not eliminate the problem. The court considered the defendants' action in entering into the Standstill Agreement as one factor among many in determining that "an injunction is necessary to enforce the defendants' status quo obligations under the RLA." *UAL*, 2008 WL 4936847, *43.

We agree that a voluntary cessation of wrongful conduct is a factor for the court to consider in deciding whether an injunction is necessary. *See Milwaukee Police Ass'n v. Jones*, 192 F.3d 742, 747 (7th Cir. 1999) (voluntary cessation of activity does not render a case moot unless the defendant can demonstrate that there is no reasonable expectation that the wrong will be repeated).[1] The defendants have attempted to characterize the Standstill Agreement as a "voluntary" cessation of any job actions. The district court, however, was within its discretion to find that an agreement signed only after a lawsuit has been filed is not voluntary, and that even a voluntary cessation is not

---

[1] We understand that the defendants are not arguing that the case is moot because of the Standstill Agreement. Rather, the defendants claim that because of the Standstill Agreement, no injunction is necessary under the NLGA and the preliminary injunction should be dissolved. We nonetheless find the mootness cases relevant to the analysis of voluntary cessations.

determinative. The court may consider how easily former practices might be resumed at any time in determining the appropriateness of injunctive relief. *Id*. ALPA and the defendants had employed means of communication, such as the telephone trees, that left no trail of evidence. Without the threat of contempt, the district court could reason that ALPA would continue to say one thing in public and to the court, and another thing to its members.

The SPC—the Strike Preparedness Committee—had been reactivated. ALPA had demonstrated an ability to convey messages secretly to pilots who feared retaliation based on prior experience. The individual defendants had been "less than candid" in their testimony. In combination with the other facts we describe above, the court was within its discretion in finding that an injunction was the only means of assuring compliance with the status quo provisions of the RLA. *See Burlington Northern*, 367 F.3d at 678 (we review an order to grant or deny a preliminary injunction under a highly deferential abuse of discretion standard).

### III.

For the reasons stated above, we affirm the judgment of the district court.

AFFIRMED.